## Gordon, Huffaker and Garnett v. Morrow, Governor.

(Decided February 13, 1920.)

### Motion to Dissolve Injunction.

1.  Mandamus—Governor—Right to Control Acts of By Mandamus or Injunction.—The Governor may be compelled by mandamus to per-

form specified duties enjoined upon him by law and may also be enjoined from the attempted performance of acts that he has no lawful right to do.

2. District and Prosecuting Attorneys—County Attorney—Duty to Attend to Cases for the State in his County—Not Required to Leave His County.—The county attorney, although under a duty to represent the state in his county, is not required to leave his county to attend to business for the state unless he is compensated therefor.

3. Attorney General—Governor—Employment of Special Counsel— Purposes for Which May Be Employed.—The Governor when requested so to do by the attorney general may employ special counsel in any action, proceeding, prosecution or matter affecting the interest of the Commonwealth.

4. Mandamus—Governor—Power and Discretion of—When Court May Control.—When the Constitution or law of the state points out the course the Governor must pursue, or the law of the land as expounded by the courts places limits upon his authority, he is bound by them to the same extent as any other officer and may be compelled by mandamus or injunction to observe the rules laid down by the Constitution, statutes or the courts, but in matters where his duty is not thus prescribed his discretion will not be interfered with.

5. Attorney and Client—Governor—When Governor May Cancel Contract With Attorneys.—Where attorneys have been employed by the Governor to represent the state, he may discharge them and substitute others in their place upon the same terms as could a private client.

6. Attorney and Client—Discharge of Attorney and Substitution of Others—Conditions Imposed.—A client may at any time discharge his attorneys and substitute others in their place, but if they have performed services under the contract they are entitled to be compensated therefor.

7. Attorney and Client—Conditions Upon Which Client May Discharge His Attorneys and Substitute Others.—Where no suit has been brought by the attorney, the client may discharge him upon notice at any time, but if suit has been brought by the attorney, a client can only discharge him upon notice and motion in the court in which the suit is pending and with the consent of the court. In such a case the court should put the client upon terms to pay or secure the compensation to which the attorney is entitled for services rendered.

8. States—Action Against—What Is Not.—Where attorneys have been employed by the Governor to represent the state, a suit by them against the auditor to have a warrant for the compensation to which they are entitled under the contract or entitled, if discharged by the Governor, is not a suit against the state.

9. Attorney and Client—Compensation of Attorney—Measure of When Discharged Before Termination of Suit.—Where an at-

torney is discharged without cause, after he has performed services under a contract, he will be entitled to recover compensation to the extent of the value of the services rendered.

A. C. VANWINKLE, J. S. LAURENT and TRABUE, DOOLAN, HELM & HELM for plaintiffs.

CHARLES I. DAWSON, Attorney General, for defendant.

OPINION BY CHIEF JUSTICE CARROLL—Dissolving injunction.

This case, presenting a very unusual state of fact as well as novel questions of law, comes before me on a motion to dissolve an injunction granted to the plaintiffs by the judge of the Franklin circuit court, in the suit of Robert G. Gordon, Hite Huffaker and James Garnett against Edwin P. Morrow, Governor of the Commonwealth of Kentucky.

The suit was brought by the plaintiffs, who are attorneys at law, to restrain Governor Morrow from cancelling or attempting to cancel, by executive order or otherwise, a contract entered into on October 10th, 1917, between the Commonwealth of Kentucky and these attorneys, under which they were employed to ascertain the value of the estate of Mrs. Mary Lily Bingham and collect therefrom the inheritance taxes due the Commonwealth.

The circumstances out of which this litigation arose are these: On October 10, 1917, the Hon. Charles H. Morris, then attorney general of the state, addressed a letter to the Hon. A. O. Stanley, then Governor of the Commonwealth, setting forth in substance that, after investigating conditions connected with the estate left by Mrs. Mary Lily Bingham in reference to the amount of inheritance taxes due therefrom to the Commonwealth, he was of the opinion that special counsel should be employed to investigate the question and take such action as might be necessary to collect for the state the inheritance taxes and, therefore, he requested the appointment by the Governor of special counsel.

Pursuant to this request, Governor Stanley, on October 10, 1917, entered into a written contract with Robert G. Gordon, Hite Huffaker and James Garnett, under which they were employed "to represent the Commonwealth of Kentucky in the ascertainment of the amount

and collection of inheritance taxes due or which may be due the Commonwealth of Kentucky from the estate of the beneficiaries of said Mrs. Mary Lily Bingham, deceased, or the legal representatives of said estate."

In accepting the employment, the attorneys obligated themselves to investigate the nature and extent of the estate subject to inheritance tax, and to institute and conduct, in any and all courts within or without the Commonwealth, any and all litigation which in their judgment or the judgment of the attorney general might be . necessary and proper to collect any tax found to be due.

It was further provided in the contract that all rea-. sonable traveling and other necessary expenses incurred by the attorneys, both in and out of the state on business connected with the employment, should be treated as a part of the consideration for the contract and as a part of the compensation for the services rendered, and be paid on vouchers approved by the Governor, when accompanied by proper receipts. It was further stipulated that the compensation to be paid to the attorneys out of the state treasury was a certain fee of $10,000.00, $5,000.00 of which should be paid upon the execution of the contract, and the remaining $5,000.00 on January 1st, 1918, by vouchers approved by the Governor; that in the event the taxes should be collected without litigation or with litigation in the county court of Jefferson county, they should receive, as compensation, a sum equal to two and one-half per cent of the amount of taxes collected to be paid, less the sum of $10,000.00 as and when the taxes were collected, or the payment secured by bond, as prescribed by law; that in the event the collection of taxes should involve litigation in any court or courts other than the county court of Jefferson county, Kentucky, then the attorneys in lieu of the two and one-half per cent were to receive a sum equal to five per cent of the aggregate amount of all taxes collected or secured to be collected, less $10,000.00.

This contract was signed by A. O. Stanley, as Governor of the Commonwealth, and the attorneys, and approved by Charles H. Morris, attorney general.

Governor Stanley resigned his office in May, 1919, and the Hon. Jame D. Black succeeded him as Governor and held the office until December 9th, 1919, when he was succeeded by Hon. Edwin P. Morrow, who had been elected Governor for a term of four years at the Novem-

ber election, 1919. It further appears that during the administration of Governor Black, the contract was by agreement so modified as that the attorneys relinquished one-fourth of the contingent fee to which they might become entitled under the contract.

The petition asking for the injunction, which was filed by the attorneys on December 9th, 1919, the day on which Edwin P. Morrow was inducted into office as Governor of the Commonwealth, set out in substance: That immediately upon the execution of the contract, they entered upon and began to discharge the duties undertaken by them, and proceeded to make a thorough investigation of the nature, extent and value of the property belonging to the estate; that for this purpose they were required to and did make trips to the state of New York and to the state of Florida, interviewed a great number of persons, and examined and cross-examined many witnesses in the taking of depositions; that they made an extensive and through examination of the legal questions presented, and instituted proceedings that are yet pending in the Jefferson county court, for the purpose of recovering the inheritance taxes that they believed to be due by the estate; that the estimated value of the estate subject to inheritance taxes in this state was found by the appraiser to be more than $103,000,000.00; that every step in the proceedings has been vigorously contested by counsel representing the estate; that since the institution of the proceedings and as a result of their efforts, the administrator of the estate has paid inheritance taxes to the sheriff of Jefferson county, Kentucky, for the Commonwealth, the sum of $853,258.84; that in their opinion there is yet due from the estate the further sum of $3,854,062.04; that they are the only persons who represent the Commonwealth in connection with the collection of these taxes; that the only compensation they had received for their services was the $10,000.00 stipulated as a certain fee in the contract; that all papers relating to the case in which the Commonwealth has an interest have been filed in the Jefferson county court, and they have no money or property in their possession of any kind belonging to or in which the Commowealth has any interest.

They further averred that Governor Morrow, during his campaign for the office of Governor, "repeatedly and publicly stated his intention to discharge these plain-

tiffs and to repudiate and cancel their contract with the Commonwealth of Kentucky immediately upon his becoming Governor of said Commonwealth, and to substitute other attorneys in place of these plaintiffs in said proceedings," and that said threat has been by him reiterated on numerous occasions since his election.

They further averred they had at all times, since their employment, taken all steps that could or should be taken in behalf of the Commonwealth, and have prosecuted faithfully and vigorously all proceedings that were proper or necessary for the purpose of collecting the inheritance taxes; that the Hon. Edwin P. Morrow, Governor elect, was, without right or justification, wrongfully threatening to cancel the contract with the Commonwealth and to prevent the prosecution by them of the proceedings for which they were employed; and was wrongfully threatening to deprive them of the rights and benefits to which they were entitled and of the compensation agreed to be paid to them by the Commonwealth under the terms of the contract; that he has not offered to compensate or secure them for any services they have performed under the contract, and that unless the services agreed by them to be performed are actually performed by them, as provided in the contract, they will be unable to collect by suit or otherwise their contract compensation, for the reason that they can not maintain a suit against the Commonwealth or the purpose of recovering it.

They further averred that unless Governor Morrow was enjoined and restrained, he would carry out his threatened repudiation of the contract and cancel or attempt to cancel the same, and that such an act or attempted act on his part would produce great and irreparable injury and damage to them, as well as to the Commonwealth. Therefore, they prayed in the petition that Governor Morrow be enjoined and restrained from cancelling or attempting to cancel by executive order or otherwise, the contract entered into on October 10th, 1917, by the Commonwealth of Kentucky, with these plaintiffs, and that he be enjoined and restrained from interfering or in any wise attempting to prevent these plaintiffs from carrying out and performing the terms of said contract.

Upon the same day that the petition was filed, Hon. Robert L. Stout, judge of the Franklin circuit court, on

the motion of the plaintiffs, made and issued a temporary restraining order in accordance with the prayer of the petition, which was on that day executed upon Governor Morrow.

Thereafter, counsel for Governor Morrow filed a special as well as a general demurrer to the petition, and the case having been submitted on the plaintiffs' motion for an injunction and the demurrers filed on behalf of Governor Morrow, Judge Stout overruled the demurrers and continued in force the restraining order previously granted; saying in the course of an opinion that while Governor Morrow had the right to cancel the contract and summarily discharge the attorneys, he could not do so until the attorneys had been paid or secured in the compensation due them for services rendered, as they had no lien upon any funds or property in their hands out of which they could be protected in the compensation due them for services rendered, and could not sue the state or compel the auditor of the state to issue to them a warrant for the value of their services.

The special demurrer was filed upon the theory that the courts have no jurisdiction to enjoin the Governor from exercising governmental, political or discretionary powers, and that as the purpose of this suit was to have the court direct and control the action of the chief executive of the state in a matter within his discretion, the court had no jurisdiction of the subject matter of the action.

It may readily be conceded that the courts will not undertake, either by mandamus or by injunction, to control or direct the exercise by the Governor of political or discretionary acts the performance of which he assumes. In respect to these, the power given him will not be interfered with. There is no conflict in the authorities as to this principle which applies alike to all officers, great or small.

The Governor, however, is not above or beyond the reach of the law when its authority has been rightfully invoked, and it has been settled by this court that the Governor may be compelled by mandamus to perform, upon his refusal to do so, specified duties enjoined upon him by law. Traynor v. Beckham, Governor, 116 Ky. 13; McCreary, Governor v. Williams, 153 Ky. 49; Jarvis v. Stanley, 176 Ky. 630.

It has also been ruled that the Governor may be enjoined from the performance or attempted performance in his official capacity of acts that he had no lawful right to do. Scott v. McCreary, Governor, 148 Ky. 797; McCreary, Governor v. Speer, 156 Ky. 783.

These writs, however, will only issue to compel the public officer, whoever he may be, to do something that the law makes it his duty to do, or to restrain him from doing something . that the law directs he shall not do. Marbury v. Madison, First Cranch, 170, 2 Law Ed. 60; Kendall v. United States, 12 Peters 610; 9 Law Ed. 1181; United States v. Blaine, 138 U. S. 306, 35 Law Ed. 183; Lowe v. Phelps, 14 Bush 642; Norman v. Board of Mgrs., 93 Ky. 537.

So if Governor Morrow had no lawful right to cancel this contract or discharge these attorneys, there could be no doubt that he might be restrained from doing so in the suit brought by these plaintiffs if they had no other adequate remedy. But as the special demurrer only raises the question that the court had no jurisdiction of the defendant or the subject matter of the action, we think it was properly overruled by Judge Stout, because the court did have jurisdiction of the defendant as Governor of the state and of the subject matter of the action.

Coming now to the general demurrer which challenges the sufficiency of the petition to support a cause of action, the first contention of counsel for the Governor is that the contract made between Governor Stanley and these attorneys was void and, of course, if this ground is well taken, the general demurrer should have been sustained.

In considering this assertion of counsel, it will be necessary to examine certain sections of the Kentucky Statutes. It is provided in section 112-1, that: "The attorney general shall be the chief law officer of the Commonwealth, and all its departments. The attorney general shall appear for the Commonwealth in the trial and argument of all cases, civil and criminal, in the Kentucky Court of Appeals whenever the Commonwealth is directly or indirectly interested; he shall appear in behalf of the Commonwealth in any court or tribunal in or out of this state in any case or proceeding in which the Commonwealth is a party in interest, except where it is made the duty of the Commonwealth's attorney or county at-

torney to represent the Commonwealth. He shall institute all actions·and proceedings necessary to cause the payment of all judgments and demands of the Commonwealth, payable at the state treasury, not discharged in the proper time. He shall, with the assistance of the auditor of public accounts, investigate the condition of all unsatisfied claims, demands, accounts, and judgments in favor of the Commonwealth, and shall take all necessary steps, by motion, action or otherwise, to collect or cause to be collected such claims, demands, accounts and judgments, and paid into state treasury.''

Also in section 112-5, that: ''The attorney general and his assistants shall attend to all litigation and business in or out of the state, required of him or them under this act, or other existing law or laws hereinafter enacted, and also any litigation or business that any state officer may have in connection with or growing out of his official duty; and no state officer, board of trustees or the head of any department or institution of the state shall have authority to employ or to be represented by any other counsel or attorney at law, unless an emergency arises, which, in the opinion of the attorney general, requires the employment of other counsel, in order to properly protect the interest of the Commonwealth, in which event the attorney general shall, in writing, setting forth the reasons for such employment, request the Governor to employ such additional counsel. Before such employment, said written requests shall be filed in the office of the secretary of state, and shall be a public record, and a copy thereof shall be retained and kept on file in the office of the attorney general.

''Before such counsel is employed, his fee and compensation shall be agreed upon and fixed by written contract by the Governor and said counsel, subject to the approval of the attorney general, and copies thereof shall be kept on file in the office of the attorney general and the secretary of state.''

It is further provided in section 4281-0, Kentucky Statutes, in speaking of the collection of inheritance taxes, that: ''Whenever the sheriff or collector of any county shall have reason to believe that any tax is due and unpaid under the provisions of this chapter, after the failure or refusal of the person interested in the property liable to said tax to pay the same, he shall notify the county attorney of the proper county, in writ-

ing, of such failure to pay such tax, and the county attorney so notified, if he has probable cause to believe a tax is due and unpaid, shall prosecute the proceedings in the county court, as provided in section 14 (4281n) of this chapter, for the enforcement and collection of such tax."

Accordingly, it is said that as these sections provide that the attorney general shall appear for the Commonwealth in all cases "except where it is made the duty of the Commonwealth or county attorney to represent the Commonwealth;" and that it shall be the duty of the county attorney to institute and prosecute proceedings for the collection of inheritance taxes, the attorney general had no authority to request the Governor to employ special counsel to collect or assist in the collection of the inheritance taxes, as the attorney general can only ask special counsel in cases that it is made his duty by the statute to attend to, and the request being without authority of law the Governor had no power to enter into the contract made with these attorneys.

In support of this contention, reliance is had on the cases of Coulter, Auditor v. Denny, 23 Ky. Law Rep. 1619; Commonwealth v. Southern Pacific Company, 127 Ky. 358.

In the Denny case, the attorney general of the state employed Denny, a practicing attorney, to represent the Commonwealth in the prosecution of proceedings instituted in Boyle county, by a revenue agent, to compel Granville Cecil to list certain property for taxation, which it was claimed had been omitted by the assessor. As a result of the litigation, Cecil was required to and did pay into the state treasury $1,800.00 in taxes, and thereafter Denny brought a mandamus suit against Coulter, auditor, to compel him to issue a warrant for his agreed fee of $250.00.

In considering the case, the court put its decision that Denny was not entitled to the relief sought, upon the ground that the attorney general had no authority to employ him to represent the Commonwealth.

The employment in that case was made under a statute then in existence which authorized the attorney general to attend to all cases and proceedings in which the Commonwealth was interested, except where it was made the duty of the Commonwealth's or county attorney to represent the Commonwealth. He was also given au-

thority to employ such attorneys as might be necessary to aid him in the investigation and collection of claims due the Commonwealth, their services to be compensated by a specified per cent of the amount recovered.

There was another statute providing that it should be the duty of the county attorney to represent the state in such proceedings as were instituted against Cecil, and accordingly the court held that as it was the duty of the county attorney of Boyle county to have prosecuted the proceedings brought by the auditor's agent against Cecil the attorney general had no authority to employ special counsel. The same conclusion was arrived at by the court in the Southern Pacific Company case, *supra*.

There is, however, a marked difference between the cases relied on and this one, growing out of the fact that in those cases it does not appear that it was necessary that the county attorney should leave his county to attend to them, while in this case it was necessary that the attorneys for the state should visit, interview persons and take many depositions in other states; and the importance of this difference becomes apparent when attention is called to the fact that under sections 126-127, of the Kentucky Statutes, the county attorney is not required to go outside of his county in looking after the interest of the state in any matter that he might be obliged to attend to in his county. Terrell v. Fiscal Court of Trimble County, 128 Ky. 519; Rogers v. Slaton, 130 Ky. 423.

Therefore, in cases in which the county attorney under the statute was not required to go out of his county the state might be unrepresented by counsel if the attorney general could not attend nor special counsel be employed.

The statute should not be given the narrow construction insisted on by counsel. Nor does it forbid the employment of special counsel in cases that it is not made the duty of the attorney general to attend to.

The attorney general is the chief law officer of the Commonwealth and the Governor the chief magistrate, and the section of the statute referred to and under which this employment was made was enacted for the purpose of conferring upon the Governor the authority to employ special counsel, when requested so to do by the attorney general, in any action, proceeding, prosecution or matter affecting the interest of the Commonwealth;

and it is not indispensable to the validity of such employment that the statute should have made it the duty of the attorney general to represent the Commonwealth in the action, proceeding, prosecution or matter concerning which special counsel are employed. Commonwealth v. Roberta Coal Company, 186 Ky. 394.

It may be said that this liberal construction of the statute places large discretion in the hands of the attorney general and the Governor. This is true, but one purpose of the statute in allowing employment of special counsel was to make provision for cases such as this and to leave it to the sound judgment of these two high officers of the state to decide when an emergency demanded the employment of special counsel.

Manifestly, it is better for the interest of the state that they should be allowed this discretion and be permitted, in cases of great importance to the state, to employ special counsel rather than leave the interest of the state to be looked after by counsel that might not be fitted by experience or ability to represent it, or to be left unrepresented when it was not the duty of the county or Commonwealth's attorney to attend and the attorney general could not.

This case furnishes a fine example of the necessity for giving to the statute a liberal and such a construction as will protect the interest of the state. Here we have a suit involving the collection of several million dollars in taxes alleged to be due the state. To contest the right of the state to collect these taxes, able counsel have been employed, and, without meaning any reflection whatever upon the county attorney of Jefferson county, or any other county attorney in the state, it is not going too far to say that any person acquainted with the character and nature of the case, and the amount of money involved, would at once agree that an emergency existed requiring the employment of special counsel when the attorney general of the state declared the necessity for such employment.

Therefore, on the record before me, the request of the attorney general, as well as the contract made by the Governor, appear to be regular and authorized by law.

Another question raised is the power of the Governor to cancel the contract and substitute other attorneys. Counsel for the state say he has this power, while counsel for the plaintiff attorneys argue that he has not.

There is, however, no dispute between counsel about the fact that a private client may, upon conditions that will later be noticed, discharge his attorney at any time with or without cause and without reference to the nature of the contract or the provision it makes as to compensation, or whether the compensation is fixed or contigent. But it is insisted by counsel for the attorneys that the Governor of the state does not occupy the attitude of a private client and, therefore, it is said that he cannot discharge attorneys employed, as were these attorneys under a contract or substitute without their consent other attorneys in their place.

This contention of counsel is rested on the proposition that the Governor is a mere agent of the state, having only such authority as is conferred upon him by the Constitution and laws of the state, and his power being thus limited the Constitution or the statute must be looked to for his authority when he undertakes to perform any official duty.

It is further said that as the employment of these attorneys was expressly authorized by the statute, and there is no provision giving to the Governor the right to discharge them and substitute other attorneys in their place, he could not do so. It may be conceded that a private agent, acting under limited authority, can only do the things that his authority authorizes him to do, and if such an agent was authorized by his principal to employ counsel in a particular case, he could not, without the consent or direction of his principal, discharge them after they had been employed, but the limitations, under which private agents with specified powers act, are not to be applied to the Governor of the state. He is more than a mere agent. In the performance of his official duties he speaks for and represents the whole people of the state, and when he acts within the bounds of the discretionary powers reposed in him, he is responsible only to the people whose servant he is. He has no principal whose advice or instruction he must obey.

Of course, if the Constitution or the law of the state points out in any particular case or with respect to any specified matter the course he must pursue, he is under a legal duty to follow it, and so if the law of the land, as expounded by the courts place limits upon his authority or furnishes a rule of official conduct that he must observe, he is bound by it to the same extent as would

be any other officer, but these are the only limitations imposed upon his authority when he assumes to act in his capacity as chief magistrate of the state. It may also be true that these limited restraints leave the Governor great freedom in exercising the duties and powers of his office and place in his possession much uncontrolled authority.

But this must be inevitably so, when there are considered the high place he holds and the great power reposed in him by the people in selecting him to direct and control, within the limits of the Constitution and the laws, the affairs of state.

It would be impossible to attempt by statute to regulate the multitude of things that the Governor may be called on to deal with in the performance of widespread, important and ever changing official duties; and this court fully recognizing the constitutional mandate that leaves each of the three great departments of the government to exercise for itself the powers belonging to it, has never sought to extend its authority to an interference with executive acts, unless the exercise of this authority was clearly within the scope of its jurisdiction. Page v. Hardin, 8 B. M. 648; Taylor v. Beckham, 108 Ky. 278; Pratt v. Breckinridge, 122 Ky. page 1.

The case we have furnishes an example of the discretion that the Governor may exercise. There is no statute forbidding the Governor to remove special counsel and substitute others in their place, and this being so we think he may act with the same freedom that a private client might exercise in respect to such a matter.

Looking at this feature of the case as if the relations between the Governor and these attorneys were the same as would be the relations between a private client and his attorney, there is no disagreement between counsel or conflict in the authorities as to the right of a private client at any time, and with or without cause, and without reference to the nature of the compensation to be paid, or whether it is on a fixed or contingent basis, to discharge his attorneys and substitute others in their place, upon the condition that he pays or secures them in the payment of their compensation on a *quantum meruit* basis.

The general rule upon this subject is thus stated in Thornton on Attorneys at Law, vol. 1, section 138: "A client may revoke the authority of his attorney at any

time with or without cause, even where the fee is contingent, and subject only to a liability for the services rendered. No special formality is required to effect the discharge, unless of course the relation was created by a power of attorney. Indeed, the right of a client to so discharge his attorney is practically indispensable in view of the delicate and confidential relations which exist between attorney and client, and of the evil to the client's interests, engendered by friction or distrust. Nor can the general right of the client to discharge his attorney be affected by any previous arrangement subsisting between them. Upon the attorney's discharge the rights and duties of the parties as attorney and client cease. Whether a discharge was with, or without, cause bears only on the right of the attorney to compensation, and the amount thereof; and this feature of the question will be considered in that connection. As to what constitutes a sufficient cause for the discharge of an attorney by his client, although no hard and fast rule can be laid down, it may be said generally that, the relation of attorney and client being one of mutual trust, confidence, and good will, any conduct on the part of the attorney which must necessarily put an end to these justifies the client in terminating the relation."

In section 143, in speaking of the right of substitution, it is said: "A client undoubtedly has the right to change counsel at any time with or without cause; and where the counsel whose dismissal is desired, is attorney of record in pending litigation, the client is entitled to have another attorney substituted in his stead, even though he has given an irrevocable power of attorney to the one first employed. Nor is such right to substitution precluded by the fact that the action has been settled and discontinued by the attorney of record without authority. It has been deemed essential to the preservation of those confidential relations which ought to prevail between counsel and client, that the client should have the right, under all reasonable conditions, to select and change his attorney at will. Every attorney enters into the service of his client subject to the rule that his client may so dismiss or supersede him, and if he makes a contract for future services to his client, it is necessarily subject to such rule, and made with full knowledge that he may never perform such service, for the reason that his client

may not keep him, and, in that event, that he will not be paid therefor, but will be entitled to compensation only for the services he has actually rendered.''

Out of many cases supporting this text, we may cite the following: Henry v. Vance, 111 Ky. 72; Breathitt Coal Company v. Gregory, 25 Ky. Law Rep. 1507; Goodin v. Hays, 28 Ky. Law Rep. 112; In re Paschal, 10 Wallace 438, 19 Law Ed. 992; Curtis v. Richards, 4 Idaho, 434; In re Cable, 99 New York Supp. 1096; In re Mitchell, 66 New York Supp. 961; Lederer v. Goldston, 117 New York Supp. 151; Martin v. Camp, L. R. A. 1917 F. 406; Louque v. Dejan, 129 La. 519, 38 L. R. A. (N. S.) 387; Stearns v. Woolenberg, 51 Ore. 88, 14 L. R. A. (N. S.) 1095

Passing this, it is further urged by counsel that if it should be assumed that the Governor occupies toward special counsel the attitude of a private client, he should not be permitted to discharge them without cause or substitute others in their place, because, as is said, he cannot be compelled, as a private client might, to compensate the attorneys for the services they had rendered before their dismissal.

If it should be assumed that these attorneys could not be paid or secured to be paid in the compensation to which they are entitled, I would find no difficulty in agreeing with counsel that the Governor could not discharge them or substitute other counsel in their place.

It would be manifestly unjust, as well as dishonest, to say that the Governor of the state might dismiss without cause attorneys lawfully employed upon a contingent basis before they had received any part of their contingent fee, although they had rendered valuable services to the state, if it was not within the power of the Governor to compensate the attorneys, or not within their power to secure the compensation to which they were entitled. No more than a private client can the Governor have the services of attorneys for the benefit of the state, engaged under a contract, on its face regular and lawful, and then without cause discharge them and substitute other counsel in their place, if it is not within his power or theirs to make such arrangements as will secure to the attorneys the compensation to which they are entitled.

His discretionary authority does not go to this extent. When the Governor, under and by virtue of the Statute, makes a contract for the use and benefit of the

state, if he desires to cancel it, he can only do so upon the same terms and conditions that a private citizen could. His executive place does not authorize or permit him to break with impunity or at his pleasure, or upon his own terms, valid contracts that he or his predecessor have entered into, as a contract made pursuant to statutory authority by the Governor for the state has the same binding force and effect as the contract of an individual. Franklin County Court v. Deposit Bank of Frankfort, 87 Ky. 370.

Let us see now if the compensation to which these attorneys are entitled can be paid or secured to them. That they are not entitled to a mandamus against the auditor of the state to compel him to issue to them a warrant on the state treasurer for their earned compensation, or any part thereof, must be admitted. The remedy by mandamus proceedings is only available to compel the state auditor to issue a warrant for a specified sum to which it is clearly made to appear the party seeking the aid of the writ is entitled. Garrard County Court v. McKee, 11 Bush 234; Hickman County v. Moore, 2 Bush 108.

As said in Montenegro-Riehm Music Company v. Board of Education of Louisville, 147 Ky. 720: "The Code provision confines the exercise of this remedy to cases in which an executive or ministerial officer declines or omits to perform an act, the performance or omission of which is enjoined by law. . . . It was not contemplated that in cases of this character disputed issues of fact should be settled, but that the rights of the parties should be determined by such issues of law as might be presented by the pleadings, or an agreed state of facts, or a state of facts about which there could be little dispute. As said in Lowe v. Phelps, 14 Bush, 642:

" 'It must, therefore, appear upon every application for mandamus that it is the legal duty of the respondent to do that which it is sought to compel him to do, and that he has upon proper application refused to perform that duty.' To the same effect is Shine v. Kentucky Cen. R. Co., 85 Ky. 177; Norman v. Board of Managers, 93 Ky. 537; Dickens v. Cave Hill Cemetery Co., 93 Ky. 385; Cassidy v. Young, 92 Ky. 227; McDonald v. Jenkins, 93 Ky. 249.

"It was not intended to aid a plaintiff in the enforce-

ment of a mere contract right, or to take the place of the other remedies provided by law for the adjudication of disputed claims.''

So that these attorneys, the amount of whose compensation has not been ascertained or determined, would be left remediless if they were obliged to resort to mandamus proceedings before the amount of their compensation had been authoritatively fixed, as they have no funds in their possession out of which they could be paid, and if they did would not have a lien thereon to secure their compensation. Hendrick v. Posey, 104 Ky. 19.

Nor should they, in securing their compensation, be required to resort to the uncertain and probably unavailing effort of appealing to the legislature of the state to give them the right to bring a suit against the state for the recovery of their compensation, which, under section 231 of the Constitution, they could not do unless the general assembly authorized the institution of such an action.

There is, however, an adequate, expeditious and satisfactory means by which these attorneys can secure the compensation to which they may be entitled. They are the attorneys of record in the suit brought by the state to recover these inheritance taxes; that suit or proceeding is now pending in the county court of Jefferson county; and the Governor can only discharge these attorneys and substitute others in their place by going into that court, after reasonable notice to them, and moving the court to permit him to discharge these attorneys and substitute others in their stead.

If no suit has been brought, then, of course, a private client, or the Governor, might dismiss his attorneys by giving to them the usual notice of dismissal and terminate at once their connection with the case, leaving them to the usual remedies afforded in cases where a contract has been broken without cause. But when suit has been brought by the attorneys and they appear on the court records as attorneys for the party who desires to dispense with their service, he can only so do upon motion after notice in the court in which the suit is pending.

The reason for this practice is that the attorneys are officers of the court, and when they appear of record the court and other parties connected with the case have the right to deal with them as the authorized counsel of the party for whom they appear on the record. No other at-

torneys except those appearing on the record have the right to come into the case without their consent or the consent of the court, or take any steps therein or have any connection therewith. Walton v. Sugg, Phillips' Law (N. C.) 98; 93 Am. Dec. 570; Belivean v. Amoskeago Co., 68 N. H. 225, 44 L. R. A. 166.

It is the further practice that when a client desires to discharge his attorneys of record and substitute others in their place, he can only do so with the consent of the court, after notice to the attorneys, which consent would go as a matter of course if the attorneys made no objection, or it was made to appear that the dismissal and desired substitution were for good cause. When, however, no cause affecting the integrity, fidelity or ability of the attorneys is shown and the attorneys objecting to their dismissal bring it to the attention of the court that they are entitled to compensation for services rendered, the court before making any order of dismissal or substitution will put the client on terms to pay or secure to be paid the compensation to which the attorneys may be entitled, or will require the client as a condition precedent to the discharge and substitution to consent that such proceedings may be taken as will secure to the attorneys their compensation. New York Phonograph Co. v. Edison Phonograph Co., 150 Fed. 233; DuBois, Mayor v. City of New York, 134 Fed. 570; Board of Comrs. v. Younger, 29 Cal. 147, 87 Am. Dec. 164, and note; Curtis v Richards, 4 Idaho, 434, 95 Am. State Rep. 134; Matter of Dunn, 205 N. Y. 398, Am. cases, 1913 E. 536.

Further supporting this practice, we may again refer to Thornton on Attorneys at Law, vol. 1, section 147, where it is said, supported by many authorities: "In allowing an application for the substitution of counsel, the court may impose such terms as are justified by the facts as being proper and equitable between the litigant and the attorney whose removal is sought; or the application may be allowed unconditionally if that course is warranted. This question generally presents itself where, on an application for substitution, counsel request the court to protect them in so far as compensation has become due, or lien rights have accrued to them. It has been stated heretofore that the client may not only discharge his attorney at any time with or without cause, but that he may also have other counsel substituted to represent him in pending actions. It is evident, however,

that these rules, if unlimited, would not only work injury to the attorney originally retained, but would actually put into the hands of discontented clients and over anxious lawyers a weapon wherewith to defraud him; and that this is the actual result of the unrestricted operation of these rules is evidenced not only by many adjudicated cases, but by the experience of practitioners generally in those states wherein no legislative or other action has been taken for the protection of counsel fees in this respect.''

And section 148 that: ''Where, on motion to substitute attorneys, the amount due is disputed, or the existence of a lien controverted, the court may determine these issues for itself in a summary manner, or the questions presented may be referred to a referee. Substitution may be allowed, however, and security required, pending the proceeding before the referee.''

Applying these rules of practice to the case before me, if the Governor, after notice to the attorneys, moves the court to permit him to dismiss them and substitute other attorneys in their place, the court, upon the request of the attorneys sought to be dismissed, should, before entering the motion of the Governor, put him upon terms to consent of record that the compensation to which these attorneys are entitled for services rendered may be determined by the court with the assistance of a jury, if one is demanded, and that the judgment of the court, when entered, shall be treated as approved by the Governor, either party having the right to an appeal to be prosecuted in the time and manner and under the practice relating to appeals in other civil cases, except that no supersedeas bond need be executed by the Governor if an appeal should be taken at his instance. When there is a final judgment, the attorneys may demand of the auditor of state the compensation they have been awarded and it will be his duty to issue his warrant on the state treasurer for the amount thereof.

It may be suggested that the practice outlined, the effect given to the final judgment, and the duty of the state auditor in reference thereto, are not expressly authorized by the statute and are prohibited by the spirit and purpose of section 231, of the Constitution, which forbids suits against the state, unless by legislative authority. It is true there is no express statutory authority authorizing the state auditor to issue a warrant in

payment of a judgment such as may be rendered in this proceeding. But neither is there any statutory authority authorizing or directing the state auditor to pay to special counsel employed by the Governor, upon the request of the attorney general, the compensation to which they may be entitled under the contract of employment. And yet it would hardly be questioned that the state auditor would be under a duty to issue a warrant for such compensation when the voucher therefor had been approved by the Governor.

When the legislature enacted the statute permitting the employment of special counsel and authorizing the compensation to be fixed by the Governor, this was in itself a legislative direction to the auditor to issue a warrant for the approved compensation; and there can be no difference made between the right and duty of the auditor to issue a warrant for the compensation to which these attorneys may be found entitled, and his right and duty to issue a warrant for the amount to which they would be entitled if they had prosecuted the case to a conclusion and thereby become entitled to the compensation fixed in the contract.

Nor will the proceeding to ascertain and determine by the judgment of the court the amount to which these attorneys may be entitled as compensation for services rendered be any more a suit against the state within the meaning of section 231 of the Constitution, than would a mandamus suit by these attorneys against the auditor to compel him to issue to them a warrant for the amount due them under the contract, if they had prosecuted the case in which they were employed to a final conclusion and had thereby become entitled to their contract compensation.

If in such a case the auditor should refuse to issue a warrant for the contract compensation, after the amount thereof had been approved by the Governor, there can be no doubt that the attorneys could bring a mandamus suit to compel him to do so, because, as we have said, the legislature in authorizing the employment of special counsel also authorized such counsel to take such action as might be necessary to recover the compensation to which they were entitled; and when attorneys employed by the Governor are discharged without cause and their compensation determined in the manner we have stated,

they should have exactly the same remedy for the collection of their compensation that they would have had if it had been earned and the amount determined as provided for in the contract.

It follows from what we have said that the attorneys in this case have a complete remedy by and through which they can recover the compensation to which they are entitled.

Thus being secure in their remedy, it is not necessary that they should be paid before they are discharged and other attorneys substituted in their place. The discharge and the substitution should be made by the court when the Governor has consented to the terms thereof in the manner we have outlined.

The remaining question is the measure of compensation to which these attorneys are entitled. That it should be on the *quantum meruit* basis was determined by this court in Henry v. Vance, 111 Ky. 72, where the court said: "If the discharge is without cause, and after the attorney entered upon and performed part of the services, he will undoubtedly be entitled to recover at least to the extent of the value of the services rendered. But generally the attorney should be relegated to an action to recover on *quantum meruit*, where he has been prevented by the client or other fact not his fault, from fully discharging the services contemplated by his contract."

It is further said in that case that: "In estimating such value, the jury should consider the extent of services rendered, and those to be rendered, allowing the contract price, abated by such sum as is reasonably represented by the unperformed part of the labor."

This measure of recovery was undoubtedly right in the Henry case, because when the controversy between the attorneys, who had been discharged during the litigation, and their clients came up, the litigation had been terminated and the amount of the recovery by the client definitely ascertained. In other words, in that case, the attorneys were employed, as they claimed, under a contract by which they were to receive an amount equal to 35 per cent of the recovery, and were discharged before the sum sought to be recovered had been paid, but when the suit by the discharged attorneys to recover their alleged contract fee was brought, the full amount they had been employed to recover had been paid to their clients

and so the sum the clients had received was definitely known.

In this case, however, it has not been and may not be for many months, perhaps years, finally determined what amount of inheritance taxes, if any, in addition to what has been paid, will be recovered by the state. Therefore, as it cannot be known what amount will ultimately be recovered by the state until there has been a final decision in the litigation, it is obvious that the amount recovered by the client cannot afford any standard by which the compensation of the attorneys in this case can be measured.

It is averred in the petition that the amount heretofore paid by the estate was secured by the efforts of these attorneys, and it is possible that nothing, in addition to this, may be recovered; possibly the whole sum sought may be recovered, but what the amount of recovery will be is at this time purely a matter of speculation, impossible of ascertainment; and consequently the compensation to which the attorneys are entitled must be the value of the services rendered by them from the date of the contract until their discharge, less whatever sums they have received. What this amount shall be is a question that must be determined by the court or jury upon the evidence.

Under the views expressed, these attorneys occupy exactly the same position they would occupy if they had been employed by a private citizen under a contract containing stipulations as to compensation like the one here in question and had been discharged by their client before the termination of the employment or before there had been a final judgment in the litigation. Their rights and remedies, as well as that of the Governor, are the same as those that would be applied in a controversy like this between a private client and his attorneys.

As the Governor could not at any time after the contract was made and cannot hereafter discharge these attorneys or substitute others in their place, except in the manner and upon the terms we have indicated, the averments of the petition upon which the injunction was issued had no foundation in fact or law. No matter what threats of dismissal the Governor may have made or what he intended to or would do, he could not cancel their contract of employment by executive order or otherwise than as we have stated.

Having thus a complete remedy for the recovery of the compensation to which they are entitled, it necessarily follows that they showed no right to have an injunction, and the one issued by Judge Stout is now dissolved.

The whole court heard and considered this case with me and concur in what I have written and the conclusion reached.